21

ADDENDUM

FILED

MAR 0 2 2016

UNITED STATES
BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

To:     Russell Brown
        Chapter 13 Trustee

Re:     Dawn Wedel (debtor)
        Case # 2-15-bk-07499 DPC

Date:   February 24, 2016

This letter is in response to the Trustee request on 02/12/16 for explanation as to how the value
was determined as Debtor's ex-husband (the other shareholder) offered $10,000 to buy her
interest from the Chapter 7 trustee.

This $10,000 offer was not a legitimate or genuine offer, because the owners' 2006 binding Employment
Agreement forbids this type of action on the part of the shareholders. It was a subversive attempt by the
ex-husband to engage in a hostile takeover of the business from the debtor, which has been her principle
source of work and income for over 20 years. Her position in the company was again confirmed to her in
the binding Employment Agreement which was drawn up when they split, after having been together 20
years, with consideration that both had established the business and worked in it since its onset in 1992.

It was known that no outside buyer would be interested in the lab, as it has been and is in decline, in a
hostile market environment, having lost most of our accounts, and also unable to obtain needed contracts
with insurance company payors. Debtor had requested a number of times prior (in recent years) for ex-
husband to buy her out with a reasonable offer. He refused even to consider, repeatedly saying the
business was worth nothing. He had also called a Board of Directors meeting in the 2014 to announce, in
writing, his retirement in 90 days. This was never carried out at that time, but he has since been
expressing his wish to retire. He has undertaken many hostile and illegal actions against the debtor,
trying to force her out of the business, in order to give her employment position and resulting income to
his current live-in girl friend. It is pertinent, and needs to be understood, that this individual (his girlfriend)
has not been able to find her own employment because of her past history of theft. Therefore, that is the
explanation of why the ex-husband wants the debtor out of the business. Before this individual came into
the picture, the debtor and ex-husband worked quite well together, with no threats or subversive actions
on his part against her.

The ex-husband has engaged in unilateral actions against the specific provisions of their 2006
Employment Agreements, which clearly specify that, even though the ex-husband owns 60% of the shares,
ALL material decisions regarding the business MUST be made by mutual and unanimous consent of the
parties. One cannot sell the other's shares or force a buy-out without the other's consent. He clearly
violated this. Debtor's business legal counsel advised her it would be enforceable in a court of law.

His plan was to offer the trustee an amount for the debtor's shares, in exchange for full ownership of the
company. He did this, and he immediately fired the debtor, with intent to leave her unemployed. After
this action on his part, one of the accounts of the business hired a physician's assistant, enabling more
biopsy procedures to be performed and sent to debtor's business to be processed. Debtor was forced to
switch from Ch. 7 to Ch. 13 status, in order to keep her employment and livelihood. Her 40% ownership
results in no profit, as there is no profit to the business.

Since 2011, the business has not been able to pay the two owners their respective entitled wages, pursuant to the Employment Agreement, and relevant to their job descriptions and duties performed. This is actually a liability that the business owes each of them, but is and has been unable to pay. The wages that both shareholders receive each month are notably less than would be commanded in the marketplace for such duties, and also much less than their Employment Agreement stipulates they each receive.

Their wages are to be classified as salary up to $8,300/month for the debtor, and up to $18,300/month for the ex-husband. These amounts have not been fully paid since 2011, when the business lost virtually all its accounts (except the 2 current ones), due to the changes in healthcare environment. Since these amounts are owed to the shareholders, no outside buyer would be interested in purchasing the business. They would also have to become liable for all prior years' potential malpractice claims. Another deterrent for a buyer would be the marketplace conditions for small histology labs. The trend is strongly slanted, favoring the single-payor modality, forcing all small labs out of the marketplace, not being able to compete with the big labs, and not getting the contracts with major insurance companies, and not having financial clout and market share to obtain these. As it stands, the business has to write off approx. 75% of what it bills out, due to this factor of being out of network with insurance carriers.

All histology labs received a draconian 50% cut in Medicare reimbursement rates, beginning in Jan., 2013. All the other insurance company payors followed suit. This destroyed the histology lab viability and profitibility. The only way histology services are profitable now is if they're part of a larger lab that performs other services, such as clinical pathology processing and diagnosing. The histology service component is performed at a loss. No other medical service received such a draconian cut such as the histology sector. This was deliberately negotiated by the two largest full service labs' lobbyists on Capital Hill, in order to capture virtually all market share, and squeeze the small, independent specialty labs (such as HealthWise) out of business.

.

*[signature]*
2/24/16

**NOTE to Trustee** Russell Brown

Re:  Dawn Wedel (debtor)
Case #2-15-bk-07499

Date:  February 24, 2016

Please be advised that the totals shown on the Ch. 13 Monthly Business Operating Statements reflect income and expenses as to the date they show in my check register.  Sometimes the deposits may have occurred at the end of the month, but were posted at the beginning of the following month by the bank.  In these cases, I have and am consistently reporting them as they are accrued, rather than the date they were posted by the bank.  If you want me to change this procedure moving forward, please let me know.

Since the billing person handles all the electronic EFT payments from insurance companies, I am not knowledgeable of these amounts until the following month, when she faxes them to me, and I enter them in the check register with the date on the EFT posting (not bank posting).  I do not bank online.  Then, from mid-month to mid-month, I calculate the outgoing business expense payments.

Also, the calculation of Warren Gillette's and my wages occurs mid-month, AFTER all other business expenses are paid.  The way it is calculated is to include all income from the cut-off date the month prior (usually the 17th) through the day of calculation (usually the 17th or 18th) of the current month.  The **binding Employment Agreement in force since 2006 stipulates monthly salary for Warren Gillette in the amount of $18,300, and to me for $8,300 for services performed**.  Since 2011, due to significant business downturn, **these have not been able to be paid**.  Please see attached Response Letter for full explanation.  These are a liability of the company to each of us, primarily to Warren Gillette.  He has repeatedly requested to be reimbursed these amounts.

Also, please note, if the business wage income falls short, as it often does, for me to make my monthly bankruptcy payments and other essential obligations, then I can and have to work overtime for my son in his small landscaping company's office, who pays me an hourly wage.  Despite the grueling and very tiring hours, I am committed to being able to make my $377/month payment for Ch. 13, along with my other bills and obligations.  I have no other choice.  It is a struggle, but I must make it work, and with God's help, I can and will.  Thank you for your consideration regarding this.

**Please also note that Warren Gillette's Ch. 7 bankruptcy court trustee recently (the year prior) assigned a value of $3,700 to his 60% of HealthWise Medical Lab.**  Since that valuation, business income has gone down, as we subsequently lost the Dr. Hummel account.


2/24/16

( d/b/a Health Wise Medical lab - see p. 3
for
salary
requirement
for business
partner. )

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made by and between Arizona Statewide Anatomic Pathology, Inc. ("Employer") and Warren Gillette ("Employee").

## WITNESSETH:

WHEREAS, Employer presently employs Employee and Employer is desirous of continuing to employ Employee in an executive capacity on the terms and conditions, and for the consideration, hereinafter set forth and Employee is desirous of continuing in the employ of Employer on such terms and conditions and for such consideration.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and obligations contained herein, Employer and Employee agree as follows:

## ARTICLE 1:  POSITION AND DUTIES

1.1  During the term of employment under this Agreement Employer shall employ Employee in the position of medical director, or in such other positions as the parties mutually may agree. The Employee shall perform the duties set out in the job description attached to this Agreement. These duties may be modified and updated by the Employer from time to time following agreement with the Employee. The Employee also agrees to perform all other reasonable duties and comply with reasonable instructions issued by the Employer. The Employee shall report to the Board of Directors or to any other representative of the Employer designated from time to time by the Board.

1.2  Employee agrees, during the period of his employment by Employer, to devote his full business time, energy and best efforts to the business and affairs of Employer and its affiliates and not to engage, directly or indirectly, in any other business, investment, or activity that interferes with Employee's performance of Employee's duties hereunder, is contrary to the interests of Employer or any of its affiliates, or requires any significant portion of Employee's business time.

1.3  Employee acknowledges and agrees that Employee owes a fiduciary duty of loyalty, fidelity and allegiance to act at all times in the best interests of Employer and to do no act which would injure the business, interests, or reputation of Employer or any of its subsidiaries or affiliates. In keeping with these duties, Employee shall make full disclosure to Employer of all business opportunities pertaining to Employer's business and shall not appropriate for Employee's own benefit business opportunities concerning the subject matter of the fiduciary relationship.

1.4  It is agreed that any direct or indirect interest in, connection with, or benefit from any outside activities, particularly commercial activities, which interest might in any way adversely affect Employer or any of its affiliates, involves a possible conflict of interest. In keeping with Employee's fiduciary duties to Employer, Employee agrees that Employee shall not knowingly become involved in a conflict of interest with Employer or any of its affiliates, or upon discovery thereof, allow such

Page 1 of 9

a conflict to continue. Moreover, Employee agrees that Employee shall disclose to the Employer in writing any facts which might involve such a conflict of interest that has not been approved by Employer's Board of Directors. Employer and Employee recognize that it is impossible to provide an exhaustive list of actions or interests which constitute a "conflict of interest". Moreover, Employer and Employee recognize there are many borderline situations. In some instances, full disclosure of facts by Employee may be all that is necessary to enable Employer or its affiliates to protect its interests. In others, if no improper motivation appears to exist and the interests of Employer or its affiliates have not suffered, prompt elimination of the outside interest will suffice. In still others, it may be necessary for Employer to terminate the employment relationship. Employee agrees that Employer's determination as to whether a conflict of interest exists shall be conclusive. Employer reserves the right to take such action as, in its judgment, will end the conflict.

## ARTICLE 2: NATURE AND TERM OF THE AGREEMENT

The Employment Agreement is an individual employment agreement entered into between the Employer and Employee. The employment shall commence on April 1, 2006 and shall continue until either party terminates the agreement in accordance with the terms of this Agreement. The clauses of this Agreement may be varied or updated by agreement between the parties at any time. This Agreement shall be subject to the Settlement Agreement between Warren Gillette and Yvonne Wedel entered into on _____April 27_____, 2006.

## ARTICLE 3: OBLIGATIONS OF THE RELATIONSHIP

3.1 The Employer shall:

    (i)    Act as a good employer in all dealings with Employee;

    (ii)    Deal with the Employee and any representative of the Employee in good faith in all aspects of the employment relationship; and

    (iii)    Take all practicable steps to provide the Employee with a safe and healthy work environment.

3.2 The Employee shall:

    (i)    Comply with all reasonable and lawful instructions provided to them by the Employer;

    (ii)    Perform their duties with all reasonable skill and diligence;

    (iii)    Conduct their duties in the best interests of the Employer and the employment relationship;

    (iv)    Deal with the Employer in good faith in all aspects of the employment relationship;

    (v)    Comply with all policies and procedures (including any Codes of Conduct) implemented by the Employer from time to time; and

(vi)    Take all practicable steps to perform the job in a way that is safe and health for themselves and their fellow employees.

## ARTICLE 4:  THE PLACE OF WORK

The parties agree that the Employee shall perform their duties at 14795 N. 78th Way #700, Scottsdale, Arizona and 8361 E. Evans Road, Suite 107, Scottsdale, Arizona.

## ARTICLE 5:  HOURS OF WORK

5.1  Working Hours.  The Employee's hours of work shall be the number of hours per week required to complete the assigned responsibilities of Employee in a timely and competent manner.

5.2. Variation of Working Hours.  The Employee's hours of work may be varied as follows:

(i)  By mutual agreement between Employer and Employee; or

(ii) If agreement cannot be reached, by the Employer, following consultation with the Employee, provided that the Employee's minimum hours of work are not increased above the number of hours required as of April 1, 2006 to complete all work necessary relating to Employee's job description.

When seeking to vary the Employee's hours, the Employer shall act reasonably, and shall take into account the Employee's personal circumstances and commitments as of April 1, 2006.

## ARTICLE 6.  WAGES/SALARY/ALLOWANCES

6.1  Types of Pay.  The Employee's salary shall be $18,333 which shall be paid monthly on the first day of each month.

6.2  Reimbursement of Expenses.  The Employee shall be entitled to reimbursement by the Employer of all expenses reasonably and properly incurred by the Employee in the performance of their duties, provided the Employee produces appropriate receipts to the Employer when requesting reimbursement.

6.3  Reimbursement of Travel Expenses.  The Employee may be required to travel from time to time as part of their duties. The Employer shall reimburse the Employee for their reasonable work related travel and accommodation costs upon production of appropriate receipts.

## ARTICLE 7.  HOLIDAYS AND LEAVE ENTITLEMENTS

7.1  Annual Leave.  The Employee shall be entitled to reasonable vacations and holidays. Employee shall be responsible for the maintenance of his duties during the time of any such absence.

To the extent the absence requires the hiring of temporary personnel or Employer incurs additional incremental expenses during the vacation period of Employee, Employee shall be solely responsible for the payment of that additional or incremental expense. Employee shall not take any action that unreasonably jeopardizes the continued efficient operation of Employer's business including taking any extended vacation periods.

7.2 Public Holidays. The Employee shall be obligated to work on a public holiday if required by the interests of Employer.

7.3 Sick Leave. The Employee shall be entitled to 5 days sick leave for each 12 month period of service. Sick leave can be taken where the Employee is sick or where the Employee's spouse or a person who is dependent on the Employee is sick or injured.

ARTICLE 8. OTHER ENTITLEMENTS/BENEFITS

8.1 Personal Development. Employee shall be entitled to a reasonable sum by way of a grant to attend a course or training which has been approved by the Employer, such approval not to be unreasonably withheld.

8.2 Indemnity. The Employer shall, to the extent permissible under law, indemnify the Employee from and against all actions, claims and demands brought against the Employee by any third party relating to the performance of the Employee's employment, provided that the Employee's actions were in good faith and did not involve recklessness, wilful neglect or any wilful failure to carry out a lawful instruction from the Employer.

ARTICLE 9. HEALTH AND SAFETY

Both the Employer and the Employee shall comply with their obligations under OSHA. This includes the Employer taking all practicable steps to provide the Employee with a healthy and safe working environment. The Employee shall comply with all directions and instructions from the Employer regarding health and safety and shall take all reasonable steps to ensure that in the performance of their employment they do not undermine their own health and safety or the health and safety of any other person.

ARTICLE 10. OTHER EMPLOYMENT OBLIGATIONS

10.1 Confidential Information. The Employee shall not, whether during the currency of this Agreement or after its termination for whatever reason, use, disclose or distribute to any person or entity, otherwise than as necessary for the proper performance of their duties and responsibilities under this Agreement, or as required by law, any confidential information, messages, data or trade secrets acquired by the Employee in the course of performing their services under this Agreement. This includes, but is not limited to, information about the Employer's business, customers, insurance company payors, service providers or any other essential contacts.

Page 4 of 9

10.2   Copyrights. All work produced for the Employer by the Employee under this Agreement or otherwise and the right to the copyright and all other intellectual property in all such work is to be the sole property of the Employer.

10.3   Conflicts of Interest. The Employee agrees that there are no contracts, restrictions or other matters which would interfere with their ability to discharge their obligations under this Agreement. If, while performing their duties and responsibilities under this Agreement, the Employee becomes aware of any potential or actual conflict between their interests and those of the Employer, then the Employee shall immediately inform the Employer and other owners in writing. Where the Employer forms the view that such a conflict does or could exist, it may direct the Employee to take action(s) to resolve that conflict, and the Employee shall comply with that instruction. When acting in their capacity as Employee, the Employee shall not, either directly or indirectly, receive or accept for their own benefit or the benefit of any person or entity other than the Employer any gratuity, emolument, or payment of any kind from any person having or intending to have any business with the Employer.

10.4   Use of Internet and E-mail. The Employee will have access to email and the Internet in the course of their employment. The Employee shall ensure that at all times their use of the email and Internet facilities at work meets the ethical and social standards of the workplace. Whilst a reasonable level of personal use is acceptable to the Employer, this must not interfere with the Employee's employment duties or obligations, and must not be illegal or contrary to the interests of the Employer. The Employee shall also comply with all email and Internet policies issued by the Employer from time to time.

10.5   Disclosure to Employee. Employer shall disclose to Employee, or place Employee in a position to have access to or develop, trade secrets or confidential information of Employer or its affiliates; and/or shall entrust Employee with business opportunities of Employer or its affiliates; and/or shall place Employee in a position to develop business good will on behalf of Employer or its affiliates.

10.6   Disclosure to and Property of Employer.   All information, ideas, concepts, improvements, discoveries, and inventions, whether patentable or not, which are conceived, made, developed, or acquired by Employee, individually or in conjunction with others, during Employee's employment by Employer (whether during business hours or otherwise and whether on Employer's premises or otherwise) which relate to Employer's business, products, or services (including, without limitation, all such information relating to corporate opportunities, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within the customer's organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names, and marks) shall be disclosed to Employer and are and shall be the sole and exclusive property of Employer. Moreover, all documents, drawing, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps and all other writings or materials of any type embodying any of such information,

Page 5 of 9

ideals, concepts, improvements, discoveries, and inventions are and shall be the sole and exclusive property of Employer. Upon termination of Employee's Employment by Employer, for any reason, Employee promptly shall deliver the same, and all copies thereof, to Employer.

 10.7 No Unauthorized Use or Disclosure. Employee will not, at any time during or after Employee's Employment by Employer, make any unauthorized disclosure of any confidential business information or trade secrets of Employer or its affiliates, or make any use thereof, except in the carrying out of Employee's employment responsibilities hereunder. Affiliates of Employer shall be third party beneficiaries of Employee's obligations under this paragraph. As a result of Employee's employment by Employer, Employee may also from time to time have access to, or knowledge of, confidential business information or trade secrets of third parties, such as customers, suppliers, partners, joint venturers, and the like, of Employer and its affiliates. Employee also agrees to preserve and protect the confidentiality of such third party confidential information and trade secrets to the same extent, and on the same basis, as Employer's confidential business information and trade secrets.

 10.8. Restraint of Trade - Non-Competition. The Employee agrees that for a period of 2 years following the termination of their employment for whatever reason, they shall not, either personally, or as an employee, consultant or agent for any other entity or employer, carry on business in competition with the Employer within Maricopa County, Arizona.

 10.9 Restraint of Trade - Non-Solicitation of Clients. The Employee agrees that for a period of two years following the termination of their employment for whatever reason, they shall not, either personally, or as an employee, consultant or agent for any other entity or employer, seek to solicit or carry out any work of the same nature for any client or customer of the Employer with which the Employee had any contact or dealings whilst employed by the Employer.

 10.10 Restraint of Trade - Non-Solicitation of Employees. The Employee agrees for a period of two years following the termination of their employment for whatever reason, they shall not, either personally, or as an employee, consultant or agent for any other entity or employer, solicit or engage or employ any employee of the Employer with whom the Employee had any dealings whilst employed with the Employer.

 10.11 Restraint of Trade - Severability. In the event any portion of this clause is viewed as unenforceable by any authority or court with jurisdiction to consider such clauses, the clause shall apply as modified by the authority or court, or in the event it is not modified by the authority or court, the remainder of this clause and agreement shall continue to be enforceable by the parties.

 10.12 Remedies. Employee acknowledges that money damages would not be sufficient remedy for any breach of this Article by Employee, and Employer shall be entitled to enforce the provisions of this Article by specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Article, but shall be in addition to all remedies available at law or in equity to Employer,

including the recovery of damages from Employee and her agents involved in such breach and remedies available to Employer pursuant to other agreements with Employee.

10.13 Enforcement and Remedies. Employee understands that the restrictions set forth herein may limit Employee's ability to engage in certain businesses during the period provided for herein, but acknowledges that Employee will receive sufficiently high remuneration and other benefits under this Agreement to justify such restriction. Employee acknowledges that money damages would not be sufficient remedy for any breach of this Article by Employee, and Employer shall be entitled to enforce the provisions of this Article by terminating any payments then owing to Employee under this Agreement and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Article, but shall be in addition to all remedies available at law or in equity to Employer, including, without limitation, the recovery of damages from Employee and Employee's agents involved in such breach and remedies available to Employer pursuant to other agreements with Employee.

ARTICLE 11. TERMINATION OF EMPLOYMENT

11.1 Employer's Right to Terminate. Employer shall have the right to terminate Employee's employment under this Agreement at any time for any of the following reasons:

(a) upon Employee's death;

(b) upon Employee becoming permanently disabled which for purposes of this Agreement shall mean Employee's becoming disabled so that they cannot perform their duties for a period of thirty (30) days or more.

(c) for "cause", which, for purposes of this Agreement, shall mean termination by action of the Board of Directors because of Employee's (1) conviction of a felony, (2) willful refusal without proper legal cause to perform Employee's duties and responsibilities which remains uncorrected for five days following written notice to Employee by Employer of such breach, (3) willfully engaging in conduct that he knows or should know may be materially injurious to Employer or any of its affiliates, (4) involvement in a conflict of interest for which Employer makes a determination to terminate the employment of Employee which remains uncorrected for ten days following written notice to Employee by Employer of such breach, or (5) material breach of any material provision of this Agreement which remains uncorrected for ten days following written notice to Employee by Employer of such breach.

11.2 Termination for Serious Misconduct. Notwithstanding any other provision in this Agreement, the Employer may terminate this Agreement summarily and without notice for serious misconduct on the part of the Employee. Serious misconduct includes, but is not limited to:

(i) Theft;

(ii)  Dishonesty;

(iii)  Harassment of a work colleague or customer;

(iv)  Serious or repeated failure to follow a reasonable instruction;

(v)  Deliberate destruction of any property belonging to the Employer;

(vi)  Actions which seriously damage the Employer's reputation;

(vii)  Engaging in directly or indirectly a competing business that may have a negative impact upon the business of Employer.

11.3  Termination on Medical Grounds.  In the event the Employee has been absent from work for thirty (30) days which should represent an extended break from employment because of illness, the Employer shall be entitled to require the Employee to undergo a medical examination by a registered medical practitioner nominated by the Employer, at the Employer's cost.  In assessing the Employee's fitness for work, the Employer shall take into account any report provided as a result of that examination, and any other medical report provided by the Employee within a reasonable time frame.  If, in the reasonable opinion of the Employer, the Employee is incapable of the proper performance of their duties by reason of illness, the Employer may terminate this Agreement by the provision of at least five days advance notice.

11.4  Abandonment of Employment.  In the event the Employee has been absent from work without excuse for five consecutive working days without any notification to the Employer, and the Employer has made reasonable efforts to contact the Employee, this Agreement shall automatically terminate on the expiration of the fifth day without the need for notice of termination of employment.

11.5  Employee's Obligations.  Upon the termination of this Agreement for whatever reason, or at any other time if so requested by the Employer, the Employee shall immediately return to the Employer all information, material or property (including but not limited to computer disks, printouts, manuals, reports, letters, memos, plans, diagrams, security cards, keys, and laptop computers) either belonging to or the responsibility of the Employer and all copies of that material, which are in the Employee's possession or under their control.

ARTICLE 12.  RESOLVING EMPLOYMENT RELATIONSHIP PROBLEMS.

If any employment issues arise, those should be raised with the Employer as soon as possible so that they can be resolved.  Any unresolved issues shall be submitted to mediation for resolution.

ARTICLE 13.  ACKNOWLEDGMENT OF THE AGREEMENT

13.1  The parties may vary this Agreement, provided that no variation shall be effective or binding on either party unless it is in writing and signed by both parties.

13.2  Each party acknowledges that this Agreement contains the whole and entire agreement between the parties as to the subject matter of this Agreement.

13.3   The various provisions of this Agreement are severable and if any provision is held to be invalid or unenforceable by any court of competent jurisdiction, then such invalidity or unenforceability shall not affect the remaining provisions of this Agreement.

13.4   Where requested by the Employee, the Employer shall deduct from their salary/wages any amount for matters such as theft, improper personal payments or reimbursements. The Employer shall also be entitled to deduct from any salary payment payable upon termination of employment any overpayment made to the Employee for leave taken in advance.

13.5   The Employee acknowledges that:

(i)   They have been advised of their right to seek independent advice on the terms of this Agreement;

(ii)   That they have been provided with a reasonable opportunity to take that advice;

(iii)   That they have read these terms of employment and understand these terms and their implications; and

(iv)   That they agree to be bound by these terms of employment, the procedures as implemented by the Employer from time to time, and the parties Settlement Agreement dated _April 27_, 2006.

## ARTICLE 14.   DECLARATION

I, Arizona Statewide Anatomic Pathology, Inc., offer this Employment Agreement to Warren Gillette.

Date: _4-27-06_

I, Warren Gillette, declare that I have read and understand the conditions of employment detailed above and accept them fully. I have been advised of the right to seek independent advice in relation to this Agreement, and have been allowed reasonable time to do so.

Date: _4-27-06_

_____
Warren Gillette

SOPHIA KOO
Notary Public - Arizona
Maricopa County
My Commission Expires
May 4, 2009

Page 9 of 9

*(d/b/a Healthwise Medical Lab — see p. 3
for salary
requirement for
debtor)*

# EMPLOYMENT AGREEMENT

This Employment Agreement ("Agreement") is made by and between Arizona Statewide Anatomic Pathology, Inc. ("Employer") and Yvonne Wedel ("Employee").

## WITNESSETH:

WHEREAS, Employer presently employs Employee and Employer is desirous of continuing to employ Employee in an executive capacity on the terms and conditions, and for the consideration, hereinafter set forth and Employee is desirous of continuing in the employ of Employer on such terms and conditions and for such consideration.

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and obligations contained herein, Employer and Employee agree as follows: **FILED**

## ARTICLE 1: POSITION AND DUTIES

MAR 0 2 2016

UNITED STATES
BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

1.1  During the term of employment under this Agreement Employer shall employ Employee in the position of controller/finance, or in such other positions as the parties mutually may agree. The Employee shall perform the duties set out in the job description attached to this Agreement. These duties may be modified and updated by the Employer from time to time following agreement with the Employee. The Employee also agrees to perform all other reasonable duties and comply with reasonable instructions issued by the Employer. The Employee shall report to the Board of Directors or to any other representative of the Employer designated from time to time by the Board.

1.2  Employee agrees, during the period of her employment by Employer, to devote her full business time, energy and best efforts to the business and affairs of Employer and its affiliates and not to engage, directly or indirectly, in any other business, investment, or activity that interferes with Employee's performance of Employee's duties hereunder, is contrary to the interests of Employer or any of its affiliates, or requires any significant portion of Employee's business time.

1.3  Employee acknowledges and agrees that Employee owes a fiduciary duty of loyalty, fidelity and allegiance to act at all times in the best interests of Employer and to do no act which would injure the business, interests, or reputation of Employer or any of its subsidiaries or affiliates. In keeping with these duties, Employee shall make full disclosure to Employer of all business opportunities pertaining to Employer's business and shall not appropriate for Employee's own benefit business opportunities concerning the subject matter of the fiduciary relationship.

1.4  It is agreed that any direct or indirect interest in, connection with, or benefit from any outside activities, particularly commercial activities, which interest might in any way adversely affect Employer or any of its affiliates, involves a possible conflict of interest. In keeping with Employee's fiduciary duties to Employer, Employee agrees that Employee shall not knowingly become involved in a conflict of interest with Employer or any of its affiliates, or upon discovery thereof, allow such

a conflict to continue. Moreover, Employee agrees that Employee shall disclose to the Employer in writing any facts which might involve such a conflict of interest that has not been approved by Employer's Board of Directors. Employer and Employee recognize that it is impossible to provide an exhaustive list of actions or interests which constitute a "conflict of interest". Moreover, Employer and Employee recognize there are many borderline situations. In some instances, full disclosure of facts by Employee may be all that is necessary to enable Employer or its affiliates to protect its interests. In others, if no improper motivation appears to exist and the interests of Employer or its affiliates have not suffered, prompt elimination of the outside interest will suffice. In still others, it may be necessary for Employer to terminate the employment relationship. Employee agrees that Employer's determination as to whether a conflict of interest exists shall be conclusive. Employer reserves the right to take such action as, in its judgment, will end the conflict.

## ARTICLE 2: NATURE AND TERM OF THE AGREEMENT

The Employment Agreement is an individual employment agreement entered into between Employer and Employee. The employment shall commence on April 1, 2006 and shall continue until either party terminates the agreement in accordance with the terms of this Agreement. The clauses of this Agreement may be varied or updated by agreement between the parties at any time. This Agreement shall be subject to the Settlement Agreement between Warren Gillette and Yvonne Wedel entered into on _April 27_, 2006.

## ARTICLE 3: OBLIGATIONS OF THE RELATIONSHIP

3.1 The Employer shall:

    (i) Act as a good employer in all dealings with Employee;

    (ii) Deal with the Employee and any representative of the Employee in good faith in all aspects of the employment relationship; and

    (iii) Take all practicable steps to provide the Employee with a safe and healthy work environment.

3.2 The Employee shall:

    (i) Comply with all reasonable and lawful instructions provided to them by the Employer;

    (ii) Perform their duties with all reasonable skill and diligence;

    (iii) Conduct their duties in the best interests of the Employer and the employment relationship;

    (iv) Deal with the Employer in good faith in all aspects of the employment relationship;

    (v) Comply with all policies and procedures (including any Codes of Conduct) implemented by the Employer from time to time; and

(vi)    Take all practicable steps to perform the job in a way that is safe and health for themselves and their fellow employees.

## ARTICLE 4:   THE PLACE OF WORK

The parties agree that the Employee shall perform their duties at 14795 N. 78th Way #700, Scottsdale, Arizona and 8361 E. Evans Road, Suite 107, Scottsdale, Arizona.

## ARTICLE 5:   HOURS OF WORK

5.1  Working Hours.  The Employee's hours of work shall be the number of hours per week required to complete the assigned responsibilities of Employee in a timely and competent manner.

5.2. Variation of Working Hours.  The Employee's hours of work may be varied as follows:

(i)  By mutual agreement between Employer and Employee; or

(ii) If agreement cannot be reached, by the Employer, following consultation with the Employee, provided that the Employee's minimum hours of work are not increased above the number of hours required as of April 1, 2006 to complete all work necessary relating to Employee's job description.

When seeking to vary the Employee's hours, the Employer shall act reasonably, and shall take into account the Employee's personal circumstances and commitments as of April 1, 2006.

## ARTICLE 6.   WAGES/SALARY/ALLOWANCES

6.1  Types of Pay.  The Employee's salary shall be $8,333 which shall be paid monthly on the first day of each month.

6.2 Reimbursement of Expenses.  The Employee shall be entitled to reimbursement by the Employer of all expenses reasonably and properly incurred by the Employee in the performance of their duties, provided the Employee produces appropriate receipts to the Employer when requesting reimbursement.

6.3  Reimbursement of Travel Expenses.  The Employee may be required to travel from time to time as part of their duties. The Employer shall reimburse the Employee for their reasonable work related travel and accommodation costs upon production of appropriate receipts.

## ARTICLE 7.   HOLIDAYS AND LEAVE ENTITLEMENTS

7.1  Annual Leave.  The Employee shall be entitled to reasonable vacations and holidays. Employee shall be responsible for the maintenance of her duties during the time of any such absence.

To the extent the absence requires the hiring of temporary personnel or Employer incurs additional incremental expenses during the vacation period of Employee. Employee shall be solely responsible for the payment of that additional or incremental expense. Employee shall not take any action that unreasonably jeopardizes the continued efficient operation of Employer's business including taking any extended vacation periods.

7.2 **Public Holidays.** The Employee shall be obligated to work on a public holiday if required by the interests of Employer.

7.3 **Sick Leave.** The Employee shall be entitled to 5 days sick leave for each 12 month period of service. Sick leave can be taken where the Employee is sick or where the Employee's spouse or a person who is dependent on the Employee is sick or injured.

ARTICLE 8. OTHER ENTITLEMENTS/BENEFITS

8.1 **Personal Development.** Employee shall be entitled to a reasonable sum by way of a grant to attend a course or training which has been approved by the Employer, such approval not to be unreasonably withheld.

8.2 **Indemnity.** The Employer shall, to the extent permissible under law, indemnify the Employee from and against all actions, claims and demands brought against the Employee by any third party relating to the performance of the Employee's employment, provided that the Employee's actions were in good faith and did not involve recklessness, wilful neglect or any wilful failure to carry out a lawful instruction from the Employer.

ARTICLE 9. HEALTH AND SAFETY

Both the Employer and the Employee shall comply with their obligations under OSHA. This includes the Employer taking all practicable steps to provide the Employee with a healthy and safe working environment. The Employee shall comply with all directions and instructions from the Employer regarding health and safety and shall take all reasonable steps to ensure that in the performance of their employment they do not undermine their own health and safety or the health and safety of any other person.

ARTICLE 10. OTHER EMPLOYMENT OBLIGATIONS

10.1 **Confidential Information.** The Employee shall not, whether during the currency of this Agreement or after its termination for whatever reason, use, disclose or distribute to any person or entity, otherwise than as necessary for the proper performance of their duties and responsibilities under this Agreement, or as required by law, any confidential information, messages, data or trade secrets acquired by the Employee in the course of performing their services under this Agreement. This includes, but is not limited to, information about the Employer's business, customers, insurance company payors, service providers or any other essential contacts.

10.2    Copyrights.  All work produced for the Employer by the Employee under this Agreement or otherwise and the right to the copyright and all other intellectual property in all such work is to be the sole property of the Employer.

10.3  Conflicts of Interest.  The Employee agrees that there are no contracts, restrictions or other matters which would interfere with their ability to discharge their obligations under this Agreement.  If, while performing their duties and responsibilities under this Agreement, the Employee becomes aware of any potential or actual conflict between their interests and those of the Employer, then the Employee shall immediately inform the Employer and other owners in writing. Where the Employer forms the view that such a conflict does or could exist, it may direct the Employee to take action(s) to resolve that conflict, and the Employee shall comply with that instruction.  When acting in their capacity as Employee, the Employee shall not, either directly or indirectly, receive or accept for their own benefit or the benefit of any person or entity other than the Employer any gratuity, emolument, or payment of any kind from any person having or intending to have any business with the Employer.

10.4  Use of Internet and E-mail.  The Employee will have access to email and the Internet in the course of their employment.  The Employee shall ensure that at all times their use of the email and Internet facilities at work meets the ethical and social standards of the workplace.  Whilst a reasonable level of personal use is acceptable to the Employer, this must not interfere with the Employee's employment duties or obligations, and must not be illegal or contrary to the interests of the Employer.  The Employee shall also comply with all email and Internet policies issued by the Employer from time to time.

10.5  Disclosure to Employee.  Employer shall disclose to Employee, or place Employee in a position to have access to or develop, trade secrets or confidential information of Employer or its affiliates; and/or shall entrust Employee with business opportunities of Employer or its affiliates; and/or shall place Employee in a position to develop business good will on behalf of Employer or its affiliates.

10.6    Disclosure to and Property of Employer.    All information, ideas, concepts, improvements, discoveries, and inventions, whether patentable or not, which are conceived, made, developed, or acquired by Employee, individually or in conjunction with others, during Employee's employment by Employer (whether during business hours or otherwise and whether on Employer's premises or otherwise) which relate to Employer's business, products, or services (including, without limitation, all such information relating to corporate opportunities, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or their requirements, the identity of key contacts within the customer's organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names, and marks) shall be disclosed to Employer and are and shall be the sole and exclusive property of Employer.  Moreover, all documents, drawing, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps and all other writings or materials of any type embodying any of such information,

Page 5 of 9

ideals, concepts, improvements, discoveries, and inventions are and shall be the sole and exclusive property of Employer. Upon termination of Employee's Employment by Employer, for any reason, Employee promptly shall deliver the same, and all copies thereof, to Employer.

10.7 No Unauthorized Use or Disclosure. Employee will not, at any time during or after Employee's Employment by Employer, make any unauthorized disclosure of any confidential business information or trade secrets of Employer or its affiliates, or make any use thereof, except in the carrying out of Employee's employment responsibilities hereunder. Affiliates of Employer shall be third party beneficiaries of Employee's obligations under this paragraph. As a result of Employee's employment by Employer, Employee may also from time to time have access to, or knowledge of, confidential business information or trade secrets of third parties, such as customers, suppliers, partners, joint venturers, and the like, of Employer and its affiliates. Employee also agrees to preserve and protect the confidentiality of such third party confidential information and trade secrets to the same extent, and on the same basis, as Employer's confidential business information and trade secrets.

10.8. Restraint of Trade - Non-Competition. The Employee agrees that for a period of 2 years following the termination of their employment for whatever reason, they shall not, either personally, or as an employee, consultant or agent for any other entity or employer, carry on business in competition with the Employer within Maricopa County, Arizona.

10.9 Restraint of Trade - Non-Solicitation of Clients. The Employee agrees that for a period of two years following the termination of their employment for whatever reason, they shall not, either personally, or as an employee, consultant or agent for any other entity or employer, seek to solicit or carry out any work of the same nature for any client or customer of the Employer with which the Employee had any contact or dealings whilst employed by the Employer.

10.10 Restraint of Trade - Non-Solicitation of Employees. The Employee agrees for a period of two years following the termination of their employment for whatever reason, they shall not, either personally, or as an employee, consultant or agent for any other entity or employer, solicit or engage or employ any employee of the Employer with whom the Employee had any dealings whilst employed with the Employer.

10.11 Restraint of Trade - Severability. In the event any portion of this clause is viewed as unenforceable by any authority or court with jurisdiction to consider such clauses, the clause shall apply as modified by the authority or court, or in the event it is not modified by the authority or court, the remainder of this clause and agreement shall continue to be enforceable by the parties.

10.12 Remedies. Employee acknowledges that money damages would not be sufficient remedy for any breach of this Article by Employee, and Employer shall be entitled to enforce the provisions of this Article by specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Article, but shall be in addition to all remedies available at law or in equity to Employer,

including the recovery of damages from Employee and her agents involved in such breach and remedies available to Employer pursuant to other agreements with Employee.

10.13 Enforcement and Remedies. Employee understands that the restrictions set forth herein may limit Employee's ability to engage in certain businesses during the period provided for herein, but acknowledges that Employee will receive sufficiently high remuneration and other benefits under this Agreement to justify such restriction. Employee acknowledges that money damages would not be sufficient remedy for any breach of this Article by Employee, and Employer shall be entitled to enforce the provisions of this Article by terminating any payments then owing to Employee under this Agreement and/or to specific performance and injunctive relief as remedies for such breach or any threatened breach. Such remedies shall not be deemed the exclusive remedies for a breach of this Article, but shall be in addition to all remedies available at law or in equity to Employer, including, without limitation, the recovery of damages from Employee and Employee's agents involved in such breach and remedies available to Employer pursuant to other agreements with Employee.

## ARTICLE 11. TERMINATION OF EMPLOYMENT

11.1 Employer's Right to Terminate. Employer shall have the right to terminate Employee's employment under this Agreement at any time for any of the following reasons:

(a) upon Employee's death;

(b) upon Employee becoming permanently disabled which for purposes of this Agreement shall mean Employee's becoming disabled so that they cannot perform their duties for a period of thirty (30) days or more.

(c) for "cause", which, for purposes of this Agreement, shall mean termination by action of the Board of Directors because of Employee's (1) conviction of a felony, (2) willful refusal without proper legal cause to perform Employee's duties and responsibilities which remains uncorrected for five days following written notice to Employee by Employer of such breach, (3) willfully engaging in conduct that she knows or should know may be materially injurious to Employer or any of its affiliates, (4) involvement in a conflict of interest for which Employer makes a determination to terminate the employment of Employee which remains uncorrected for ten days following written notice to Employee by Employer of such breach, or (5) material breach of any material provision of this Agreement which remains uncorrected for ten days following written notice to Employee by Employer of such breach.

11.2 Termination for Serious Misconduct. Notwithstanding any other provision in this Agreement, the Employer may terminate this Agreement summarily and without notice for serious misconduct on the part of the Employee. Serious misconduct includes, but is not limited to:

(i) Theft;

(ii) Dishonesty;

(iii) Harassment of a work colleague or customer;

(iv) Serious or repeated failure to follow a reasonable instruction;

(v) Deliberate destruction of any property belonging to the Employer;

(vi) Actions which seriously damage the Employer's reputation;

(vii) Engaging in directly or indirectly a competing business that may have a negative impact upon the business of Employer.

11.3   Termination on Medical Grounds.   In the event the Employee has been absent from work for thirty (30) days which should represent an extended break from employment because of illness, the Employer shall be entitled to require the Employee to undergo a medical examination by a registered medical practitioner nominated by the Employer, at the Employer's cost. In assessing the Employee's fitness for work, the Employer shall take into account any report provided as a result of that examination, and any other medical report provided by the Employee within a reasonable time frame. If, in the reasonable opinion of the Employer, the Employee is incapable of the proper performance of their duties by reason of illness, the Employer may terminate this Agreement by the provision of at least five days advance notice.

11.4   Abandonment of Employment.   In the event the Employee has been absent from work without excuse for five consecutive working days without any notification to the Employer, and the Employer has made reasonable efforts to contact the Employee, this Agreement shall automatically terminate on the expiration of the fifth day without the need for notice of termination of employment.

11.5   Employee's Obligations.   Upon the termination of this Agreement for whatever reason, or at any other time if so requested by the Employer, the Employee shall immediately return to the Employer all information, material or property (including but not limited to computer disks, printouts, manuals, reports, letters, memos, plans, diagrams, security cards, keys, and laptop computers) either belonging to or the responsibility of the Employer and all copies of that material, which are in the Employee's possession or under their control.

ARTICLE 12.   RESOLVING EMPLOYMENT RELATIONSHIP PROBLEMS.

If any employment issues arise, those should be raised with the Employer as soon as possible so that they can be resolved.  Any unresolved issues shall be submitted to mediation for resolution.

ARTICLE 13.   ACKNOWLEDGMENT OF THE AGREEMENT

13.1   The parties may vary this Agreement, provided that no variation shall be effective or binding on either party unless it is in writing and signed by both parties.

13.2   Each party acknowledges that this Agreement contains the whole and entire agreement between the parties as to the subject matter of this Agreement.

13.3  The various provisions of this Agreement are severable and if any provision is held to be invalid or unenforceable by any court of competent jurisdiction, then such invalidity or unenforceability shall not affect the remaining provisions of this Agreement.

13.4  Where requested by the Employee, the Employer shall deduct from their salary/wages any amount for matters such as theft, improper personal payments or reimbursements. The Employer shall also be entitled to deduct from any salary payment payable upon termination of employment any overpayment made to the Employee for leave taken in advance.

13.5  The Employee acknowledges that:

(i)  They have been advised of their right to seek independent advice on the terms of this Agreement;

(ii)  That they have been provided with a reasonable opportunity to take that advice;

(iii)  That they have read these terms of employment and understand these terms and their implications; and

(iv)  That they agree to be bound by these terms of employment, the procedures as implemented by the Employer from time to time, and the parties Settlement Agreement dated _April 27_, 2006.

ARTICLE 14.  DECLARATION

I, Arizona Statewide Anatomic Pathology, Inc., offer this Employment Agreement to Yvonne Wedel.

Date: _4 - 27 - 06_        _____

I, Yvonne Wedel, declare that I have read and understand the conditions of employment detailed above and accept them fully.  I have been advised of the right to seek independent advice in relation to this Agreement, and have been allowed reasonable time to do so.

Date _04-27-06_        _____
                          Yvonne Wedel

SOPHIA KOO
Notary Public - Arizona
Maricopa County
My Commission Expires
May 1, 2009

Page 9 of 9